# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>QUINCY JONES, <em>et al.</em>,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiffs,</td><td></td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Lead Case: GJH-21-893</td></tr>
<tr><td></td><td></td><td></td></tr>
<tr><td>PROSPER MARKETPLACE, INC., <em>et al.</em>,</td><td>*</td><td>Member Cases: GJH-21-1126;<br>GJH-21-1914</td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

In this putative class action, Plaintiffs Quincy Jones, Dae Park, and Shahid Khan sue Defendants Prosper Marketplace, Inc., Prosper Funding, LLC, Velocity Investments, LLC, and Crown Asset Management, LLC (collectively "Defendants").[1] Plaintiffs allege violations of the Maryland Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code Ann., Comm. Law. §§ 12-1001 *et seq.*, the Maryland Credit Services Businesses Act ("MCSBA"), Md. Code Ann., Com. Law §§ 14-1901 *et seq.*, the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14-201 *et seq.*, and the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 *et seq. See* No. 21-893, ECF No. 3 (*Jones,* et al. *v. Prosper Marketplace, Inc.,* et al.); No. 21-1126, ECF No. 4 (*Khan v. Crown Asset Management, LLC*). Plaintiffs seek declaratory relief under Md. Cts. & Jud. Pro. § 3-406, *see* No. 21-893, ECF No. 3; No. 21-1126, ECF No. 4; No. 21-1914, ECF No. 9 (*Khan* et al. *v. Crown Asset Management,* et al.), restitution and unjust enrichment, and assert a claim for "money had

---

[1] The Court consolidates three separate actions: No. 21-893 (*Jones* et al. *v. Prosper Marketplace, Inc.,* et al.); No. 21-1126 (*Khan v. Crown Asset Management, LLC*); No. 21-1914 (*Khan* et al. *v. Crown Asset Management, LLC,* et al.).

and received," *id.* Pending before the Court are Defendants' Motions to Compel Arbitration, No. 21-893, ECF No. 15; No. 21-1126, ECF No. 15, and Plaintiffs' Motions to Certify Questions to the Maryland Court of Appeals, No. 21-893, ECF No. 19; No. 21-1126, ECF No. 19. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, the Motions to Compel Arbitration are granted, and the Motions to Certify Questions are denied. The Court also consolidates and stays the action.[2]

## I.  BACKGROUND[3]

In these three cases, Plaintiffs Quincy Jones, Dae Park, and Shahid Khan allege that Defendants undertook predatory and unlawful lending. The Court first looks at the factual and procedural history of each case.

### A.  The *Jones* Case (No. 21-893)

Plaintiff Jones is a resident of Maryland. ECF No. 3 ¶ 21 (*Jones*). Defendant Prosper Marketplace, Inc. ("PMI"), is a Delaware corporation that offers personal consumer loan services online, including to consumers in Maryland. *Id.* ¶¶ 22, 30. Defendant Prosper Funding, LLC ("PFL"), is a subsidiary of PMI. *Id.* ¶ 24. PFL has no employees and undertakes its actions through PMI. *Id.* Collectively, PMI and PFL are known as "Prosper." *Id.* Defendant Velocity is a

---

[2] Additionally pending before the Court in case No. 21-1126 (*Khan v. Crown Asset Management, LLC*) is Defendant Crown Asset Management's Motion to Stay, No. 21-1126, ECF No. 20, which is now moot as Defendant Crown withdrew this motion on September 30, 2021, ECF No. 26.

Pending before the Court in case No. 21-1914 (*Khan* et al. *v. Crown Asset Management, LLC,* et al.) is the parties' Joint Motion to Stay Proceedings, ECF No. 21, which the Court now grants. Also pending are the State Court Motion to Dismiss filed by Defendant Crown Asset Management, LLC, ECF No. 22, and the State Court Motion for Summary Judgment filed by Plaintiff Quincy Jones, ECF No. 23, which are now dismissed as moot as they seek the adjudication of the exact matters now before the Court. *See also* 21-1126, ECF No. 20 at 5 n.3.

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Delaware limited liability company that collects debts. *Id.* ¶ 25. Velocity is an assignee of Prosper. *Id.* ¶ 93.

Prosper's business model in Maryland is to advertise and offer personal loan services through its website. *Id.* ¶ 30. Potential borrowers are directed to loan application forms on the Prosper website and are given instructions on how to complete those forms. *Id.* ¶ 31. Though the loans are branded as "Prosper" loans, the loans actually originate in the name of a state-chartered bank, WebBank. *Id.* ¶ 38. Jones alleges that WebBank had agreed with Prosper that "Prosper would advertise and market for these loans," as well as "handle all of the work necessary to originate the loans," and that each loan would then be sold to Prosper "promptly after origination." *Id.* Jones alleges that Prosper also undertook all loan underwriting and credit risk assessment, and then determined whether borrowers satisfied the criteria for the loan and, additionally, the amount of each loan. *Id.* ¶ 42. Thus, Jones contends that all payments were made to Prosper—unless loans were sold to Velocity or another debt collector. *Id.* ¶ 51.

As relevant here, on February 12, 2015, Jones received a $15,000 loan. *Id.* ¶ 99. Jones was charged a $750 "origination fee" before he received the loan. *Id.* ¶ 100. Jones alleges that Prosper's loan agreements gave Prosper the right to unilaterally change any of the provisions at any time, with no advance notice and with no opportunity for Jones to object. *Id.* ¶ 102. These loan agreements also required Jones to authorize both PFL and PMI to act as his attorney-in-fact in order to sign a promissory note agreement, which Jones alleges is in violation of Maryland law. *Id.* ¶ 103. The agreements also included a written election for CLEC to govern the loan. *Id.* ¶ 101.

Jones has paid back $18,296, more than the amount he received, but Prosper claims that Jones still owes more than that. *Id.* ¶ 106. According to Jones, when Prosper sold his loan to

Velocity, it also sold Velocity the right to collect $1,367. *Id.* ¶ 107. Velocity has filed a lawsuit against Jones demanding that he pay more than $1,367 to Velocity. *Id.* ¶ 108.

Plaintiff Dae Park took out a loan of $15,000 from Prosper on June 8, 2017. *Id.* ¶ 109. An origination fee of $750 was deducted. *Id.* ¶ 110. The loan agreements also included a modification provision giving Prosper the right to unilaterally change the terms of the agreements, and authorized both PFL and PMI to act as Park's attorney-in-fact to sign a promissory note for the loan. *Id.* ¶¶ 112, 113. PMI then signed a promissory note as Park's purported agent. *Id.* ¶ 114.

Park states that he has paid "thousands of dollars" to Prosper but that Prosper claims that Park still owes even more. *Id.* ¶¶ 116, 117. According to Park, when Prosper sold his loan to Velocity, it sold Velocity the right to collect more than $14,282 from him, in addition to what he has already paid. *Id.* ¶ 117. Velocity has also filed a lawsuit against Park, demanding that Park pay more than $14,282 to Velocity. *Id.* ¶ 118.

Jones and Park filed a putative class action complaint against Defendants Prosper Marketplace, Inc., Prosper Funding, LLC, and Velocity Instruments, LLC, in Montgomery County Circuit Court on February 9, 2021. ECF No. 1; ECF No. 3 ("*Jones*"). Plaintiffs contend that Prosper violated several provisions of Maryland consumer and debt collection law and that, as Prosper's assignee, Velocity is not, and was never, entitled to collect money from them or from any other similarly situated individual. ECF No. 3 ¶¶ 96, 97. Plaintiffs allege that Prosper is unlicensed in Maryland, *id.* ¶ 70, that Prosper misrepresented to borrowers that Prosper could be appointed as an "attorney-in-fact" and that origination fees could not be refunded, both in violation of Maryland law, *id.* ¶ 76, and that Prosper misrepresented to borrowers that they could not rescind their loans, also in violation of Maryland law, *id.* ¶ 79.

Plaintiffs requested declaratory judgment pursuant to Md. Cts. & Jud. Pro. § 3-406 (Count I), and alleged violations of the Maryland Credit Grantor Closed End Credit Provisions ("CLEC") (Count II), violations of the Maryland Credit Services Businesses Act ("MCSBA") (Count III), violations of the Maryland Consumer Debt Collection Act ("MCDCA") (Count IV), violations of the Maryland Consumer Protection Act ("MCPA") (Count V), restitution and unjust enrichment (Count VI), and money had and received (Count VII).[4] ECF No. 3 ¶¶ 133, 153, 157, 165, 168, 177, 194, 203.

Plaintiffs sue on behalf of the following Class:

> All borrowers who obtained a consumer loan through Prosper where each and every one of the following requirements are met:
>
> a. The borrower registered with Prosper in Maryland and was a Maryland resident at the time of registration;
>
> b. The agreement, note, or other evidence of the loan included a written election of the Maryland Credit Grantor Closed End Credit Provisions, Md. Code Ann., Com. Law §§12-1001 *et seq.* ("CLEC");
>
> c. The loan was originated in the name of WebBank under an advance agreement that the loan would be sold to Prosper after origination;
>
> d. PMI signed the promissory note in the transaction on WebBank's behalf with the representation that it was the "attorney in-fact" of the borrower; and,
>
> e. The borrower made one or more payments to Prosper on the loan.

*Id.* ¶ 119. Plaintiffs also sue on behalf of a Sub-Class of "all class members whose Prosper loan accounts were assigned to Velocity." *Id.* ¶ 120.

---

[4] There are two counts are labeled as the sixth count in the Complaint. *See* ECF No. 3 ¶¶ 194, 207. The Court labels the second as Count VII.

Defendants removed the action to this Court on April 8, 2021, asserting that this Court

has federal-question jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"),

28 U.S.C. § 1332(d). ECF No. 1. On April 30, 2021, Defendants filed the Motion to Compel

Arbitration and Dismiss, or, Alternatively, to Stay, and Request for a Hearing. ECF No. 15.

Plaintiffs responded in opposition, ECF No. 17, and Defendants replied, ECF No. 18. On August

30, 2021, Plaintiffs filed the Motion to Certify Questions to the Maryland Court of Appeals, ECF

No. 19, which Defendants opposed, ECF No. 20. Plaintiffs replied. ECF No. 22.

On September 14, 2021, Defendants filed the Notice of Supplemental Authority in

Support of Motion to Compel Arbitration, ECF No. 21, which Plaintiffs opposed as "contain[ing]

argument and is an improper surreply[.]" ECF No. 23.

### B.  The *Khan* Cases (Nos. 21-1126, 21-1914)[5]

Plaintiff Khan is a resident and citizen of the State of Maryland, and he was a resident of

Maryland at the time he registered, also in Maryland, for a loan from Prosper. No. 21-1126, ECF

No. 4 ¶ 21. Crown Asset Management, LLC is a Georgia limited liability company with its

principal place of business in Georgia. *Id.* ¶ 21. Crown is a debt-collector assignee of Prosper. *Id.*

¶ 77.

On September 24, 2015, Plaintiff Khan received a loan for $10,000 through Defendant

Prosper. ECF No. 4 ¶ 83 (*Khan I*). An amount of $500 was deducted from his loan proceeds as

an origination fee before Mr. Khan actually received the loan. *Id.* ¶ 84. Khan also contends that

Prosper's "form adhesion documents" for his loans included a written election for CLEC to

govern the loan and that these documents also included "multiple provisions giving Prosper the

---

[5] Plaintiff Khan acknowledges that he is a member of the Class defined in the *Jones* Complaint, No. 21-1126, ECF No. 4 at 1 n.1., therefore, it remains unclear to the Court why Plaintiff Khan, represented by the same counsel as Plaintiff Jones, chose to file an entirely separate lawsuit on the same basis.

right to unilaterally change any of its agreements" with him, at any time, without any advance notice or opportunity for him to reject the changes. *Id.* ¶¶ 85–86.

Moreover, Khan contends that these "form adhesion documents" for the loans included provisions stating that "PMI was acting on behalf of PFL and WebBank, and that Khan was required to authorize both PFL and PMI to act as Khan's attorney-in-fact to sign a promissory note for the loan." *Id.* ¶ 87. Khan alleges that PMI acted on behalf of WebBank and PFL in Khan's transaction and that it signed the promissory note for him as his purported "agent." *Id* ¶ 88. He contends that he never signed a promissory note in his transaction with Prosper. *Id.* ¶ 89.

Khan paid back more than the principal amount of the loan he received from Prosper, but he alleges that Prosper claims that it sold Crown the right to collect more than $5,194.02 from him, in addition to what he paid Prosper. *Id.* ¶ 91. Khan alleges that Crown has collected "hundreds of dollars" from him, in connection with the account Prosper sold to Crown, and that Crown has filed a lawsuit "demanding that the Court force Khan to pay more than $4,248 to Crown on account of Prosper's illegal activity." *Id.* ¶ 92.

On March 24, 2021, Khan filed a putative class action complaint in the Circuit Court for Montgomery County, Maryland. ECF No. 1 ¶ 1 (*Khan I*). Khan advances six causes of action: declaratory relief under Md. Cts. & Jud. Pro. § 3-406 (Count I), violations of the CLEC (Count II), violation of the MCDCA (Count III), violation of the MCPA (Count IV), restitution and unjust enrichment (Count V), and money had and received (Count VI). ECF No. 4.[6]

On May 7, 2021, Crown filed a Notice of Removal asserting that "this Court has original jurisdiction over the State Court Action under the Class Action Fairness Act of 2005 ("CAFA"),

---

[6] The causes of action in *Khan I* are nearly identical to the causes of action in *Jones*, except that *Jones* includes an additional allegation of "violation of the Maryland Credit Services Businesses Act" against Defendants PFL and PMI, which are not defendants in *Khan I*. *See* No. 21-893, ECF No. 3 ¶ 157; No. 21-1126, ECF No. 4 at 1 n.1.

28 U.S.C. § 1332(d)," *id.* ¶ 15. On May 24, 2021, Defendant Crown filed the now pending Motion to Compel Arbitration or, Alternatively, Stay and Request for Hearing, ECF No. 15. On June 7, 2021, Plaintiff Khan opposed the Motion to Compel Arbitration, ECF No. 17, and on June 21, 2021, Defendant Crown replied, ECF No. 18.

Then, on August 30, 2021, Plaintiff Khan filed the also pending Motion to Certify Questions to the Maryland Court of Appeals, ECF No. 19. On September 3, 2021, Defendant Crown filed a Motion to Stay, ECF No. 20. On September 13, 2021, Defendant Crown opposed the Motion to Certify Questions, ECF No. 21, and the following day, Defendant Crown filed a Notice of Supplemental Authority in Support of Motion to Compel Arbitration, ECF No. 22. On September 17, 2021, Khan filed a Reply in Support of Motion to Certify Questions, ECF No. 23. The same day, Khan submitted a letter to the Court responding to Defendant Crown's Notice of Supplemental Authority and noting that Defendant's filing "containe[d] argument and is an improper surreply," ECF No. 24, and Khan opposed Defendant Crown's Motion to Stay, ECF No. 25. On September 30, 2021, Defendant Crown filed a Notice of Withdraw of Previously Filed Motion to Stay, ECF No. 26.

Relatedly, on April 29, 2021, Khan, along with Plaintiff Jones, also filed a state court Amended Complaint Petitioning to Stay Arbitration in the Circuit Court for Montgomery County, Maryland against Defendants Crown Asset Management, Prosper Funding, LLC, Prosper Marketplace, Inc., and Velocity Investments (collectively "Defendants") ("*Khan II*"). 21-1914, ECF No. 1 ¶ 1. On July 29, 2021. Defendants removed the state court Complaint to this Court. *Id.* In the Amended Complaint, Plaintiffs Khan and Jones seek a stay of any arbitration proceedings by Defendants, specifically the arbitrations sought in *Jones* and *Khan I*, and

declarations that no arbitration agreement exists between either Plaintiff and any Defendant and that Defendants cannot compel either Plaintiff to arbitrate. ECF No. 9 at 14–15.

On August 24, 2021, Plaintiffs Khan and Jones filed the additionally pending Joint Motion to Stay Proceedings, pending a decision on the motions to compel arbitrations sought in the related cases of *Jones* and *Khan I*. ECF No. 21. In this Motion, the parties acknowledged that "a decision from this Court resolving the question of arbitrability in *Jones* and *Khan* is likely to render the above-captioned case moot[,]" *id.* ¶ 3. Additionally pending, but now moot, are the State Court Motion to Dismiss filed on August 25, 2021 by Defendant Crown, ECF No. 22, and the State Court Motion for Summary Judgment, filed the same day, by Plaintiff Jones, ECF No. 23.

## II.    STANDARD OF REVIEW

A court may compel arbitration under the Federal Arbitration Act ("FAA") if the parties agreed in writing to arbitrate the dispute. *Adkins v. Labor Ready. Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002); *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."). The FAA reflects the strong federal policy favoring arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). But "even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Adkins*, 303 F.3d at 501.

Where the parties dispute the validity of an arbitration agreement, "[m]otions to compel arbitration . . . are treated as motions for summary judgment." *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 251 (D. Md. 2011). Therefore, such motions "shall [be] grant[ed] . . . if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's

function is not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). Moreover, the Court must "view the evidence in the light most favorable to . . . the

nonmovant, and draw all reasonable inferences in her favor," *Dennis v. Columbia Colleton Med.*

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "'affirmative

obligation of the trial judge to prevent factually unsupported claims and defenses from

proceeding to trial,'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir.

2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III.   DISCUSSION

The Court first discusses its decision to consolidate these three actions. It next analyzes

Defendants' Motions to Compel Arbitration. Finally, it turns to Plaintiffs' Motions to Certify

Questions to the Maryland Court of Appeals.

### A.  Consolidation

Pursuant to Federal Rule of Civil Procedure 42(a), a court may consolidate separate

actions if they involve a "common question of law or fact." Cases meet the Rule 42(a) standard

where they are "brought against the same defendant, rely[ ] on the same witnesses, alleg[e] the

same misconduct, and answer[ ] with the same defenses." *Harris v. L & L Wings, Inc.*, 132 F.3d

978, 981 n.2 (4th Cir. 1997); *see also Lin v. Wolf*, No. 18-cv-3548, 2020 WL 9424718, at *1 (D.

Md. June 19, 2020) (consolidating actions when they were "brought against the same defendant,

raise[d] the same claims based on the same challenged practice, will likely involve the same

10

witnesses and defenses, and will require the resolution of the same legal and factual questions[,]" as well as had the same "members of the proposed class[.]").

As noted, in No. 21-893 (*Jones*), Plaintiffs Jones and Park sue Defendants Prosper Marketplace, Prosper Funding, and Velocity for violations of Maryland consumer protection law. ECF No. 3. Plaintiffs also state that they sue on behalf of themselves and a proposed class of similarly situated individuals. *Id.* ¶ 119. Similarly, in No. 21-1126 (*Khan I*), Plaintiff Khan sues Defendant Crown Asset Management, LLC, for violations of Maryland consumer protection law and acknowledges that he is a member of the Class defined in the *Jones* complaint, No. 21-1126, ECF No. 4 ¶¶ 1 n.1, 93. In No. 21-1914 (*Khan II*), Plaintiffs Khan and Jones seek a stay of the arbitration of the exact claims asserted in *Jones* and *Khan II*. ECF No. 9.

The facts, claims, and pending motions in these three cases are substantively identical. The three actions involve common questions of law and fact involving the same Plaintiffs and the same Defendants. In addition, Defendants have filed nearly identical Motions to Compel Arbitration in Nos. 21-893 and 21-1126, and Plaintiffs have filed nearly identical Motions to Certify Questions in Nos. 21-893 and 21-1126. Similarly, in No. 21-1914, the pending State Court Motion to Dismiss, ECF No. 22, and the pending State Court Motion for Summary Judgment, ECF No. 23, cover the same question implicated by the Motions to Compel Arbitration: whether the parties agreed to arbitrate their disputes. As the parties agree, these motions are mooted by *Jones* and *Khan I*. *See* No. 21-1126 (*Khan I*), ECF No. 20 at 5 n.3; No. 21-1914, ECF No. 21 ¶¶ 2–3. Thus, the Court will consolidate the actions Nos. 21-893, 21-1914, and 21-1126, with No. 21-893 (*Jones*) designated as the lead case.[7]

_____

[7] The clerk will be directed to administratively close Nos. 21-1914 and 21-1126.

**B.  Motions to Compel Arbitration**

The Court next turns to Defendants' Motions to Compel Arbitration. No. 21-839, ECF

No. 15; No. 21-1126, ECF No. 15.

### 1.  The Arbitration Agreements

There are two agreements relevant here: the Borrower Registration Agreement ("BRA")

and the Promissory Note Agreement ("Promissory Note Agreement"). As Defendants explain,

and Plaintiffs do not contest, all named Plaintiffs applied for a loan through Prosper's website.

*See* No. 21-893*, ECF No. 15-2 ¶ 4 (Bryant Decl.); No. 21-1126, ECF No. 15-2 ¶ 4 (Bryant

Decl.). At the relevant time, Prosper required confirmation of acceptance of the BRA. No. 21-

893, ECF No. 15-2 ¶¶ 7, 21; No. 21-1126, ECF No. 15-2 ¶ 7. On the screen, Plaintiffs were

presented with a statement that said, "Clicking the box below constitutes your acceptance of the

payment authorization and the borrower registration agreement," which also contained a

hyperlink denoting a link to the BRA. *Id.* ¶ 11. Plaintiffs could not continue in the process

without checking the box to confirm acceptance and then clicking a "continue" button. *Id.* ¶ 12.

Upon clicking on the hyperlink, Plaintiffs were presented with a copy of a document that

contained the then-effective BRA, and, at the end of the document and labeled as "Exhibit A," a

blank copy of the Promissory Note Agreement. No. 21-893, ECF No. 15-2 ¶¶ 7, 12; No. 21-

1126, ECF No. 15-2 ¶ 7. At the relevant time, the BRA included an arbitration provision:

> "Claim" means any dispute, claim, or controversy (whether based on contract,
> tort, intentional tort, constitution, statute, ordinance, common law, or equity,
> whether pre-existing, present, or future, and whether seeking monetary,
> injunctive, declaratory, or any other relief) arising from or relating to this
> Agreement or the relationship between us and you (including claims arising
> prior to or after the date of the Agreement, and claims that are currently the
> subject of purported class action litigation in which you are not a member of a
> certified class), and includes claims that are brought as counterclaims, cross
> claims, third party claims or otherwise, as well as disputes about the validity or
> enforceability of this Agreement or the validity or enforceability of this Section

22.

> Any Claim shall be resolved, upon the election of either us or you, by binding
> arbitration administered by the American Arbitration Association
> or JAMS, under the applicable arbitration rules of the administrator in effect at
> the time a Claim is filed ("Rules").

No. 21-893, ECF No. 15-5 ¶ 22 ("Jones BRA"); ECF No. 15-9 ¶ 18 ("Park BRA"); No. 21-1126,

ECF No. 15-5 ¶ 22 ("Khan BRA").[8] The BRA defined that the arbitration provision was

applying to:

> [T]he individual entering into this Agreement, as well as any person claiming
> through such individual, . . . WebBank, and Prosper Funding LLC and each of
> their respective parents, subsidiaries, affiliates, predecessors, successors, and
> assigns, as well as the officers, directors, and employees of each of them[.]

No. 21-893, ECF No. 15-5 ¶ 22 (Jones BRA); ECF No. 15-9 ¶ 22 (Park BRA); No. 21-1126,

ECF No. 15-5 ¶ 22 (Khan BRA). The BRA "opt-out" provision stated:

> You understand that you may reject the provisions of this Section 22, in which
> case neither us nor you will have the right to elect arbitration. Rejection of this
> Section 20 will not affect the remaining parts of this Agreement. To reject this
> Section 22, you must send us written notice of your rejection within 30 days
> after the date that this Agreement was made.

No. 21-893, ECF No. 15-5 ¶ 22(i) (Jones BRA), ECF No. 15-9 ¶ 22(i) (Park BRA); No. 21-1126,

ECF No. 15-5 ¶ 22(i) (Khan BRA).

The BRA also contained a modification provision:

> Prosper has the right to change any term or provision of this Agreement or the
> Prosper Terms and Conditions. Prosper will give you notice of material
> changes to this Agreement, or the Prosper Terms and Conditions, in the
> manner set forth in Section 16 . . . .
>
> This Agreement, along with the Prosper Terms and Conditions, represents the
> entire agreement between you and Prosper regarding your participation as a
> borrower on the platform, and supersedes all prior or contemporaneous
> communications, promises and proposals, whether oral, written or electronic,
> between you and Prosper with respect to your involvement as a borrower on

---

[8] The exact language of this provision varies slightly but is substantively identical between the BRAs of the Plaintiffs.

the platform.

No. 21-893, ECF No. 15-5 ¶ 14 (Jones BRA), ECF No. 15-9 ¶ 13 (Park BRA); No. 21-1126,

ECF No. 15-5 ¶ 14 (Khan BRA). Finally, the BRA also contained a clause authorizing Prosper to

execute promissory notes on the behalf of borrowers:

> If your listing receives sufficient lender commitments to fund, and you do not
> withdraw your listing prior to expiration of the listing period, you hereby
> authorize each of Prosper and PMI to act as your attorney-in-fact to execute a
> promissory note on your behalf in the form set forth on the attached exhibit A
> in favor of WebBank and to appoint a registrar (who may be prosper or PMI)
> to maintain a register in which such registrar will make book entry notations
> identify the owner of such promissory note, its address, and its payment
> instruments.

No. 21-893, ECF No. 15-5 ¶ 24 (Jones BRA), ECF No. 15-9 ¶ 25 (Park BRA); No. 21-1126,

ECF No. 15-5 ¶ 24 (Khan BRA).[9] A blank copy of the Promissory Note Agreement was then

included directly under the BRA. *Id.*

The Promissory Note Agreement provides substantively similar language in the

arbitration provision:

> "Claim" means any dispute, claim, or controversy (whether based on contract,
> tort, intentional tort, constitution, statute, ordinance, common law, or equity,
> whether pre-existing, present, or future, and whether seeking monetary,
> injunctive, declaratory, or any other relief) arising from or relating to this Note
> or the relationship between you and me (including claims arising prior to or
> after the date of the Note, and claims that are currently the subject of purported
> class action litigation in which I am not a member of a certified class), and
> includes claims that are brought as counterclaims, cross claims, third party
> claims or otherwise, as well as disputes about the validity or enforceability of
> this Note or the validity or enforceability of this Section 18.
>
> Any Claim shall be resolved, upon the election of either you or me, by binding
> arbitration administered by the American Arbitration Association
> or JAMS, under the applicable arbitration rules of the administrator in effect at
> the time a Claim is filed ("Rules").

---

[9] The exact language in the Power of Attorney section varies slightly among the Plaintiffs' agreements but is
substantively identical to the quoted language.

No. 21-893, ECF No. 15-6 ¶ 18 (Jones Note), ECF No. 15-10 ¶ 18 (Park Note); No. 21-1126,

ECF No. 15-6 ¶ 18 (Khan Note). The Promissory Note Agreement also defines the arbitration

agreement as applying to:

> [T]he promisor under this Note, as well as any person claiming through such
> promisor, . . .  WebBank, any person servicing this Note for WebBank, any
> subsequent holders of this Note or any interest in this Note, any person
> servicing this Note for such subsequent holder of this Note, and each of their
> respective parents, subsidiaries, affiliates, predecessors, successors, and
> assigns, as well as the officers, directors, and employees of each of them[.]

No. 21-893, ECF No. 15-6 ¶ 18 (Jones Note), ECF No. 15-10 ¶ 18 (Park Note); No. 21-1126,

ECF No. 15-6 ¶ 18 (Khan Note). The Promissory Note Agreement does not contain any

modification provision. *See* ECF No. 15-6. Instead, it contains a provision stating that:

> No provision of this Note shall be modified or limited except by a written
> agreement signed by both you and me.

No. 21-893, ECF No. 15-6 ¶ 17 (Jones Note), ECF No. 15-10 ¶ 17 (Park Note); No. 21-

1126, ECF No. 15-6 ¶ 17 (Khan Note).[10] Finally, the Promissory Note Agreement opt-

out provision states:

> I understand that I may reject the provisions of this Section 18, in which case
> neither you nor I will have the right to elect arbitration. Rejection of this
> Section 18 will not affect the remaining parts of this Note. To reject this
> Section 18, I must send you written notice of my rejection within 30 days after
> the date that this Note was made.

No. 21-893, ECF No. 15-6 ¶ 18(i) (Jones Note); ECF No. 15-10 ¶ 18(i) (Park Note); No. 21-

1126, ECF No. 15-6 ¶ 18(i) (Khan Note).

As relevant here, named Plaintiffs accessed and manifested assent to the BRA by clicking

on a box. *See* No. 21-893, ECF No. 15-2 ¶ 12; No. 21-1126, ECF No. 15-2 ¶ 12. When Plaintiffs

accessed the BRA by clicking on the link on Prosper's site, they were presented with both the

---

[10] The exact language of this provision also varies slightly but is substantively identical between the Promissory Note Agreements of the Plaintiffs.

BRA and, at the bottom, a blank copy of the Promissory Note Agreement. *See* No. 21-893, ECF No. 15-2 ¶¶ 16, 30; No. 21-1126, ECF No. 15-2 ¶¶ 15–17. Once each loan received sufficient funding commitment, PMI signed the Promissory Note Agreement for each Plaintiff, *see* No. 21-893, ECF No. 15-2 ¶¶ 18, 31; No. 21-1126, ECF No. 15-2 ¶ 18, and then later assigned all rights, interests, and title to Velocity and Crown, *see* No. 21-893, ECF No. 15-2 ¶¶ 19, 32; No. 21-1126, ECF No. 15-2 ¶ 20.[11] The Plaintiffs did not exercise the arbitration opt-out right contained within the BRA or the Promissory Note Agreement. *See* ECF No. 15-2 ¶¶ 17, 30; No. 21-1126, ECF No. 15-2 ¶ 19.

### 2.  Arbitrability[12]

The Federal Arbitration Act ("FAA") requires a district court to stay judicial proceedings and compel arbitration of any issues covered by an arbitration agreement. 9 U.S.C. § 3. "[C]ourts must 'rigorously enforce' arbitration agreements according to their terms," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S. Ct. 1238, 1241, 84 L. Ed. 2d 158 (1985) (emphasis in original).

Plaintiffs challenge whether they agreed to arbitrate their claims. ECF No. 17 at 18. Defendants argue that both the BRA and the Promissory Note Agreement delegate all "gateway"

---

[11] Plaintiffs acknowledge that Defendants Velocity and Crown "stand[] in the shoes" of Prosper. *See* No. 21-893, ECF No. 17 at 13 n.2; No. 21-1126, ECF No. 17 at 13 n.2.

[12] Here, when citing to Plaintiffs' and Defendants' arguments, the Court cites only to the briefs filed in No. 21-893 (*Jones*).

disputes, including the scope or enforceability of the arbitration provisions themselves, to an arbitrator. ECF No. 15-1 at 25.

Pursuant to the FAA, a party opposing arbitration may challenge the validity of an arbitration provision "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Whether the arbitration provision also includes an agreement to arbitrate disputes of arbitrability, sometimes called a "delegation clause," is a "gateway question" to be decided first. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002); *see also Choice Hotels Int'l, Inc. v. TK Hosp. Grp., LLC*, No. 18-cv-3364-GJH, 2019 WL 6324523, at *3 (D. Md. Nov. 26, 2019) ("Generally, the arbitrability of disputes is a 'gateway question' that should be decided by the court."). The Court must undertake two initial steps. "'First, we determine who decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if we conclude that the court is the proper forum in which to adjudicate arbitrability, we then decide whether the dispute is, in fact, arbitrable.'" *Meena Enterprises, Inc. v. Mail Boxes Etc.*, No. 12-cv-1360-DKC, 2012 WL 4863695, at *3 (D. Md. Oct. 11, 2012) (quoting *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012)).

"It is clear that 'even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate.'" *Adkins*, 303 F.3d at 501 (quoting *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997)). Importantly, "the general policy-based, federal presumption in favor of arbitration . . . is not applied as a rule of contract interpretation to resolve questions of the arbitrability of arbitrability issues themselves." *Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993); *see also Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999) ("Generally, any doubts concerning the

scope of arbitrable issues should be resolved in favor of arbitration. This presumption, however, does not apply to the issue of which claims are arbitrable.") (internal quotations and citations omitted).

Thus, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1995)). The Fourth Circuit has "routinely . . . rejected parties' attempts to rely on general contractual language to submit questions of arbitrability to the arbitrator. Accordingly, to meet the 'clear and unmistakable' standard, an agreement must contain language specifically and plainly reflecting the parties' intent to delegate disputes regarding arbitrability to an arbitrator." *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 265–66 (4th Cir. 2019) (citing *Peabody*, 665 F.3d at 103; *Carson*, 175 F.3d at 330–31)). "[W]here the agreements explicitly incorporate JAMS or AAA rules, such provisions constitute 'clear and unmistakable evidence' of intent to arbitrate arbitrability," *Collins v. Discover Fin. Servs.*, Case No. 17-cv-3011-PX, 2018 WL 6434503, at *2 (D. Md. Dec. 7, 2018), because those rules "expressly delegate arbitrability questions to the arbitrator," *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 528 (4th Cir. 2017*), abrogated on other grounds by Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524 (2019).

Here, there is "clear and unmistakable" language that delegates questions of arbitrability to an arbitrator. First, the arbitration agreement provisions in the BRA and the Promissory Note Agreement state that claims subject to arbitration include "disputes about the validity or enforceability of this Agreement or the validity or enforceability of this Section[.]" *See, e.g.*, ECF No. 15-5 ¶ 22(a); ECF No. 15-6 ¶ 18(a). Second, the arbitration provisions also state that

claims shall be resolved, "upon election by us or you," by "binding arbitration administered by the American Arbitration Association or JAMS, under the applicable arbitration rules of the administrator in effect at the time a Claim is filed[.]" ECF No. 15-5 ¶ 22(b); ECF No. 15-6 ¶ 18(b). There are two instances of "clear and unmistakable evidence" of an intent to arbitrate arbitrability. *See, e.g.*, *Choice Hotels Int'l, Inc.*, 2019 WL 6324523, at *3 (finding that a provision stating "that arbitration will be conducted in accordance with the [AAA Rules]" was clear and unmistakable evidence of intent to arbitrate arbitrability).

Plaintiffs argue, however, that these delegation clauses, as well as the rest of the arbitration provisions, are invalid. ECF No. 17 at 17, 40. Plaintiffs argue that their attack goes to the formation of the agreement to arbitrate, and thus is still a question for the Court to decide. *Id.*

Arbitration provisions are severable from the whole of the contract. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71, 130 S. Ct. 2772, 2778, 177 L. Ed. 2d 403 (2010) ("[A]s a matter of 'substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.'") (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 440, 126 S. Ct. 1204, 1206, 163 L. Ed. 2d 1038 (2006)). The Supreme Court has identified two types of challenges to a delegation provision: one type "'challenges specifically the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70 (quoting *Buckeye*, 546 U.S. at 444). Because of the severability of the arbitration provision, "'only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable.'" *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402, 87 S. Ct. 1801, 1805, 18 L. Ed. 2d 1270 (1967)). Thus, "[i]f a party challenges . . . the

precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement[.]" *Id.*

Important here, the Supreme Court has acknowledged that "[t]he issue of the agreement's 'validity' is different from the issue whether any arbitration agreement between the parties 'was ever concluded[.]'" *Rent-A-Ctr.*, 561 U.S. at 71 n.2 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444, 126 S. Ct. 1204, 1208, 163 L. Ed. 2d 1038 (2006) (noting that "[t]he issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded.")). Thus, attacks on the formation of an arbitration agreement must be decided by a court. A court "must carefully consider any claims that the agreement—including its arbitration clause—was not executed properly. Indeed, 'where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.'" *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 104–05 (4th Cir. 2012) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296, 130 S. Ct. 2847, 2856, 177 L. Ed. 2d 567 (2010)). As the Fourth Circuit has explained, "where a contract commits to arbitration those matters 'arising under' the agreement, we may not submit questions of contract formation to the arbitrator, as those questions cannot 'arise under' an agreement that was never validly formed." *Peabody Holding Co.*, 665 F.3d at 105; *see e.g.*, *Meena Enterprises, Inc.*, 2012 WL 4863695, at *3 n.4 (challenges to "whether the parties formed an agreement to arbitrate in the first instance" are heard by a court and not an arbitrator).

Here, Plaintiffs deny the formation of any valid agreement to bind them to the arbitration provision in either the BRA or the Promissory Note Agreement. Much like in *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017), Plaintiffs "expressly asserted that . . . [t]he court must resolve the validity of the

arbitration provision," *id.*, when they state that their challenge to the "existence of an arbitration or delegation agreement is for the Court to decide," ECF No. 17 at 16. Thus, Plaintiffs have challenged the validity of the delegation clauses with "'sufficient force and specificity.'" *Minnieland*, 867 F.3d at 456 (quoting *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 n.1 (4th Cir. 2016)).[13]

In addition, Plaintiffs' challenge also specifically goes to formation of an agreement to arbitrate, which is a question for a court. *See Rent-A-Ctr.*, 561 U.S. at 71 n.2; *Peabody Holding Co.*, 665 F.3d at 105. Plaintiffs allege that the arbitration provisions are underpinned by an "illusory promise" and thus lack consideration. *See Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 147, 835 A.2d 656, 661 (2003) (holding that, in Maryland, an agreement to arbitrate must be supported by consideration separate from the underlying agreement). While Plaintiffs' challenge to the delegation provision is also one that applies to the arbitration provision, "[a] party may contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement." *Hengle v. Treppa*, 19 F.4th 324, 335 (4th Cir. 2021). "[C]ourts have construed a party's argument that the 'delegation clause suffers from the same defect as the arbitration provision' to be a sufficient challenge to the delegation provision itself." *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020) (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 227 (3d Cir. 2018)).

Finally, the Plaintiffs' challenge on these grounds also does not implicate the whole of the underlying contract. *See Rent-A-Ctr., W., Inc.*, 561 U.S. at 70. Plaintiffs' challenge may be

---

[13] The Fourth Circuit has explained that a plaintiff need not challenge a delegation or arbitration provision in the Complaint. *See Minnieland*, 867 F.3d at 456 (explaining that "until a defendant moves to compel arbitration, there is no reason for a plaintiff to assert any grounds for disregarding an arbitration agreement. Accordingly, the absence of allegations in [a] complaint challenging the enforceability of the delegation provision has no bearing[.]").

considered wholly separate from the merits of the underlying contract. Thus, the Court's narrow task is to determine "whether a valid delegation provision exists." *Gibbs*, 966 F.3d at 292. In support of that task, the Court will look at the arbitration provision as severable contracts from the underlying BRA and the Promissory Note Agreement. *See id.* (noting that "because the challenge to the delegation provision necessarily encompassed and included arguments that related to the entire arbitration agreement, the district court did not err by assessing those arguments.").

The Court acknowledges that Defendants also filed a Notice of Supplemental Authority, ECF No. 21, to draw the Court's attention to *Bey v. Crown Asset Mgmt., LLC*, 2021 WL 4078657, at *2 (W.D. Pa. Sept. 8, 2021), a case with similar facts and parties. The plaintiff there challenged whether Prosper legally assigned the plaintiff's account to Crown such that the plaintiff and Crown were bound by the arbitration provision. *Id.* The *Bey* court found that the dispute must be submitted to an arbitrator because there is "distinction between a dispute as to the formation . . . and a dispute as to its validity or enforceability (which, if within the scope of the arbitration/delegation clause, should be referred to arbitration)." *Id.* at *4. Here, unlike in *Bey*, Plaintiffs do dispute whether an agreement to arbitrate was ever formed.[14] As the *Bey* court agreed, this is a formation challenge and properly decided by a court.

### 3.  Formation

The Court turns to whether agreements to arbitrate were formed. In doing so, the Court undertakes an analysis similar to one for summary judgment. *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) ("To decide whether 'sufficient facts' support a

---

[14] Additionally, Plaintiffs do not dispute that Crown and Velocity are assignees of Prosper. *See* ECF No. 17 at 13 n.2.

party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test."). In addition, the Court is mindful that the presumption in favor of arbitration does not apply here, where Plaintiffs challenge the formation of the agreements. *See Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 593 (D. Md. 2013) (citing *Noohi v. Toll Bros.*, 708 F.3d 599, 611 n.6 (4th Cir. 2013)). Finally, the Court notes that its focus is on the narrow question of whether an agreement to arbitrate was ever formed, and thus does not consider the legality of either the BRA or the Promissory Note Agreement more broadly. *See Rent-A-Ctr., W., Inc.*, 561 U.S. at 70.

"Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins*, 303 F.3d at 501 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)); *see also Noohi v. Toll Bros.*, 708 F.3d 599, 607 (4th Cir. 2013) ("'The question of whether an enforceable arbitration agreement exists . . . is a matter of contract interpretation governed by state law[.]'") (quoting *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 697 (4th Cir. 2012)). In Maryland, "the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 535 A.2d 466, 467 (1988).

The parties agree that the contracts were formed in Maryland, and Maryland law applies to formation issues. *See* ECF No. 15-1 at 30; ECF No. 17 at 18; *see also Noohi*, 708 F.3d at 607 (applying Maryland law when the "Agreement was executed in Maryland . . . and Plaintiffs [ ] resided in Maryland at the time it was executed. The Agreement also references numerous provisions of Maryland law[.]").[15]

---

[15] Defendants agree that "Maryland law governs whether an agreement to arbitrate exists." ECF No. 15-1 at 20. But Defendants then argue that Plaintiffs' challenge must be governed by other state law, characterizing Plaintiffs' claim as one challenging enforceability. *Id.* at 30. As discussed, the Court only considers the narrow question of formation.

"[U]nder Maryland law, a court examining 'whether an arbitration agreement is a valid contract' is limited to 'the language of the arbitration agreement itself.'" *Noohi*, 708 F.3d at 608 (quoting *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)). "[C]ontract terms are interpreted by considering the 'customary, ordinary, and accepted meaning of the language used.'" *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 455 (D. Md. 2020), *appeal dismissed sub nom. Harrison Morgan Cottone Cherdak v. Act, Inc.*, No. 20-cv-1335-TDC, 2020 WL 5543720 (4th Cir. July 2, 2020) (quoting *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 783 A.2d 194, 199 (2001)).

To be binding and enforceable, contracts ordinarily require consideration. *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 147, 835 A.2d 656, 661 (2003). *Cheek* is the seminal case on consideration and arbitration provisions in Maryland. The *Cheek* court considered, and then rejected, a party's argument that an underlying contract may provide consideration for an agreement to arbitrate: "To accept [the] assertion . . . would require that we inquire into, and at least make an implicit determination about, the nature of the underlying employment agreement." *Id.* at 154. The court reasoned that an "arbitration clause is a severable part of the contract . . . [and] mutual promises to arbitrate act as 'an independently enforceable contract.'" *Id.* at 153 (quoting *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 544, 649 A.2d 365, 370 (1994)); *see also Noohi*, 708 F.3d at 609 ("Maryland's highest court specifically rejected the notion that consideration for an underlying contract can serve as consideration for an arbitration provision within that contract."). The court's role is then to determine whether the arbitration provision is "supported by consideration independent of the contract underlying it, namely, mutual obligation." *Noohi*, 708 F.3d at 607. In doing so, the court must "limit[] its assessment of

---

*See Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999) (describing "lack of mutual assent and want of consideration" as "contractual formation defects").

consideration to the four corners of the [arbitration] agreement itself." *Id.; see also Cheek*, 835 A.2d at 664–65.

Regarding mutuality, a "promise [to arbitrate] becomes consideration for another promise only when it constitutes a binding obligation." *Cheek* A.2d at 661. Thus, one party's unilateral right to amend an agreement at any time can constitute an "illusory promise." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005). An "illusory promise," or one which "appears to be a promise, but it does not actually bind or obligate the promisor to anything[,]" cannot constitute a binding obligation, and thus "cannot constitute consideration." *Id.*

Therefore, courts have looked carefully at provisions allowing modification of an arbitration agreement, reaching different outcomes depending on the nature of the modification provision and how it relates, if at all, to the arbitration agreement. For example, the *Cheek* court held that an employer's promise to arbitrate was "illusory," and thus could not constitute consideration, when a modification provision was contained within the arbitration agreement. *Cheek*, 378 Md. at 149 (reasoning that "the fact that United HealthCare 'reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice' creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate."). Similarly, in *Caire*, the court reasoned that because the arbitration policy was contained within the employee handbook, and the employee handbook stated that the policies were subject to change at any time, one party "purports to retain the discretion to arbitrate or not. This is a 'non-existent' promise." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013) (citing *Howard v. King's Crossing, Inc.*, 264 F. App'x 345, 347 (4th Cir. 2008)). In *Coady*, the court reasoned that because "the Arbitration Provision and the provision giving [the] unilateral authority to change or abolish

existing policies are contained within the same Employee Manual[,]" then the mutual promise to arbitrate was "illusory." *Coady v. Nationwide Motor Sales Corp.*, No. 20-cv-1142-SAG, 2020 WL 6785352, at *5 (D. Md. Nov. 18, 2020).

In contrast, in *Hill*, the Fourth Circuit concluded that, despite a modification provision in a related agreement, an employer's promise to arbitrate was not illusory. The *Hill* court reasoned that "the Arbitration Agreement is a specific, comprehensive document, setting forth all of the parties' rights and obligations concerning arbitration[,]" which contained no modification provision. "The critical distinction between this case and *Cheek* is obvious. Unlike this case, the reservation of rights in *Cheek* was *contained* in the arbitration policy." *Id.* (emphasis in original). Because "per *Cheek*, [the court] [i]s not allowed to look beyond the separate Arbitration Agreement, signed by the parties, to determine whether the agreement was supported by consideration[,]" the *Hill* court concluded that, by the plain language of the arbitration agreement itself, there was adequate consideration.

Finally, in *Holloman*, the Maryland Court of Appeals explained that, when a modification provision includes limitations, there could still be a binding promise that constituted consideration:

> Unlike United Healthcare in *Cheek*, Circuit City does not have unfettered discretion to alter or rescind the arbitration agreement without notice or consent. Rather, under the terms of the agreement, Circuit City is bound to the terms of the arbitration agreement for 364 days, must provide thirty-days notice prior to any modification and may only alter the agreement on a single day out of the year to become effective during the next day.

*Holloman v. Cir. City Stores, Inc.*, 391 Md. 580, 592–93, 894 A.2d 547, 554 (2006). Importantly, the Court of Appeals found that limitation on modifications were "adequate to create a binding obligation on Circuit City to submit to arbitration, such that Circuit City's promise to arbitrate

under the arbitration agreement constitutes consideration[.]" *Id.* However, "unfettered" ability to change contract terms, at will, would not constitute a binding promise. *Id.*

Turning to the agreements at issue here, as an initial matter, the Court finds that the arbitration provisions contained within the BRA and the Promissory Note Agreement do, by their plain terms, contain mutual promises to arbitrate. *See, e.g.*, ECF No. 15-5 ¶ 18 ("Any Claim shall be resolved, upon the election of either you or me, by binding arbitration[.]). Neither arbitration provision binds only one party; instead, all parties are bound. *Compare Noohi,* 708 F.3d 599 at 610 (arbitration provisions lacked mutual obligation when it only bound one party: "all the subject and verb pairings relate to the buyer's obligations[,] . . . nowhere does the provision state that 'Buyer and Seller agree,' or the passive 'it is agreed.'"). Nonetheless, Plaintiffs allege that Prosper's promise to arbitrate was "illusory" because Prosper retained the discretion to alter the agreements at any time. ECF No. 17 at 12. Defendants argue that, even if the promise to arbitrate was illusory in one agreement, Plaintiffs are still bound by arbitration in another. ECF No. 15-1 at 43. With the relevant caselaw in mind, the Court looks at each agreement.

> a.    *Borrower Registration Agreement*

The arbitration agreement, and the delegation clause within it, is a provision within the BRA. *See, e.g.*, ECF No. 15-5 ¶ 22 (Jones BRA). The provision is several paragraphs long and clearly explains the parties' rights regarding arbitration and the process of arbitration. *See, e.g.*, ECF No. 15-5 ¶¶ 22(a)–(f) (Jones BRA). The agreement is in contrast to *Hill*, in which the arbitration agreement was a completely separate document, and is more similar to *Caire* and *Coady*, in which the arbitration agreements were contained within the contract. *See also Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. 14-cv-1705-PWG, 2016 WL 9724975, at *4 (D. Md. Aug. 4, 2016) (arbitration provision contained within the employee handbook).

The arbitration provision also contains an "opt-out" right that allows a signatory to submit written notice, within 30 days of signing, of rejection of the arbitration provision. *See, e.g.*, ECF No. 15-5 ¶ 22(i). The opt-out provisions provide that, upon rejection of the arbitration provision, neither party "will have the right to elect arbitration" and "[r]ejection of this Section . . . will not affect the remaining parts of this Agreement[.]" *Id.*

The BRA also contains a "right to modify terms" that provides:

> Prosper has the right to change any term or provision of this Agreement or the Prosper Terms and Conditions. Prosper will give you notice of material changes to this Agreement, or the Prosper Terms and Conditions . . .
>
> This Agreement, along with the Prosper Terms and Conditions, represents the entire agreement between you and Prosper regarding your participation as a borrower on the platform, and supersedes all prior or contemporaneous communications, promises and proposals, whether oral, written or electronic, between you and Prosper with respect to your involvement as a borrower on the platform.

*See, e.g.*, ECF No. 15-5 ¶ 14 (Jones BRA); *see also* ECF No. 15-9 ¶ 13 (Park BRA); No. 21-1126, ECF No. 15-5 ¶ 14 (Khan BRA). The modification provision does not appear within the arbitration section of the BRA. However, the modification provision appears on the same page as the arbitration provision. *Id.*

The modification provision clearly applies to the arbitration agreement. Prosper retained for itself the "right to change any term or provision of this Agreement" at will. By stating that Prosper reserved the right to change any provision of "this Agreement," the modification provision also reserves the ability to modify the arbitration provision, a provision literally within "this Agreement." Prosper thus retained the right to change the arbitration agreement in any way—which would include Plaintiffs' ability to opt out of arbitration, Prosper's promise to arbitrate, and the terms of the arbitration provision. Prosper's promise to arbitrate was thus not a

binding obligation and cannot constitute consideration. *See, e.g.*, *Brent*, 2016 WL 9724975, at *8 ("As in *Caire*, '[t]he arbitration provision [was] a policy described in the employee manual, [and] therefore, the clause stating that such a policy [was] subject to change at the sole discretion of [the employer] directly applie[d] to the Arbitration Policy.'").

Of significance, the modification provision, which gives Prosper the unilateral right "to change any term or provision of this Agreement[,]" appears on the same page and directly above the arbitration provision. As the Fourth Circuit noted, while the Court's "focus must be on the arbitration agreement, not the underlying loan agreement, it is only natural for us to interpret the arbitration agreement in light of the broader contract in which it is situated." *Hayes*, 811 F.3d at 676; *see also Coady*, 2020 WL 6785352, at *5 (a modification provision applied to the agreement to arbitrate because "the Arbitration Provision and the provision giving Nationwide unilateral authority to change or abolish existing policies are contained within the same Employee Manual."); *Caire*, 982 F. Supp. 2d at 594 (promise to arbitrate was illusory when "the Arbitration Policy is contained within the employee handbook" and "within the employee handbook is the 'Receipt and Acknowledgment' which states that 'the policies and benefits described in it are subject to change at the sole discretion of InforMed at any time.'"). In contrast, in *Hill*, the arbitration agreement was a separate document, thus the Fourth Circuit concluded that a modification provision outside of that document did not apply. *Hill*, F.3d at 544.

This Court thus agrees with the reasoning of the Court in *Coady*, which determined that it was "not persuaded that Maryland law requires it to look exclusively at the specific paragraphs within the Arbitration Provision while disregarding other paragraphs, in the same Employee Manual, with general applicability to the entire agreement." *Coady*, 2020 WL 6785352, at *5; *but see Cherdak*, 437 F. Supp. 3d at 458 (finding that because "the modification provision in the

Terms and Conditions is outside of the Arbitration Clauses and not specifically directed at the agreement to arbitrate[,]" the modification provision did not apply to the agreement to arbitrate).

Additionally, the modification provision gives "unfettered" discretion to Prosper. The modification provision does include a clause that "Prosper will give you notice of material changes to this Agreement[.]" *See, e.g.*, ECF No. 15-5 ¶ 14. But this is not a limitation on Prosper's ability to change terms in the same vein as *Holloman*. Prosper does not promise to give advance notice so that a borrower could invoke arbitration before a change becomes effective, nor does it contain any time limitation. The modification provision allows Prosper to change the arbitration provision at any time. The Court is not persuaded that the notice requirement within the modification provision limits Prosper's discretion enough such that Prosper's promise to arbitrate still constitutes a binding promise. Thus, the Court finds that no agreement to arbitrate was formed in the BRA, and Defendants may not compel arbitration under its terms.[16]

### b.    Promissory Note Agreement

Defendants argue that, no matter the Court's conclusion on the BRA, Plaintiffs also separately agreed to arbitrate their disputes under the Promissory Note Agreement, which contains a similar arbitration provision and no modification clause. ECF No. 15-1 at 43. Like the BRA provision, the arbitration provision in the Promissory Note Agreement is detailed and contains several paragraphs explaining the process and the parties' rights. *See, e.g.*, ECF No. 15-6 ¶ 18 (Jones Note). The Agreement also includes a provision that provides, "No provision of

---

[16] It does not matter that Prosper did not, in fact, change the arbitration provision. *See* ECF No. 15-2 ¶ 33. As *Cheek* states, even if a party "has not revoked nor in any way altered the Arbitration Policy . . .  the fact that [the party] reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice creates no real promise[.]" *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 149, 835 A.2d 656, 662 (2003).

this Note shall be modified or limited except by a written agreement signed by both you and me." *Id.* ¶ 17.

When Plaintiffs clicked the hyperlink to view the then-effective BRA, a document opened in a new window or tab. *See* ECF No. 15-2 ¶ 25. In the copies of the document provided to the Court, which Defendants declare are "true and correct" copies of the document displayed to Plaintiff at the time, both the BRA and the Promissory Note Agreement appear. *See, e.g.,* No. 21-893, ECF No. 15-5 at 8 (Jones BRA), ECF No. 15-9 at 9 (Park BRA); No. 21-1126, ECF No. 15-5 at 8 (Khan BRA). The Promissory Note Agreement is attached as a blank exhibit under the BRA. *See* ECF No. 15-5 at 8. By clicking assent to the BRA, Plaintiffs also "authoriz[ed] each of Prosper and PMI to act as your attorney-in-fact to execute a promissory note on your behalf in the form set forth on the attached Exhibit A[.]" No. 21-893, ECF No. 15-5 ¶ 24; ECF No. 15-9 ¶ 25; No. 21-1126, ECF No. 15-5 ¶ 24. In each case, PMI executed the Promissory Note Agreement as an attorney-in-fact for each Plaintiff within a few days of assent to the BRA. *See* No. 21-893, ECF No. 15-2 ¶¶ 18, 31; No. 21-1126, ECF No. 15-2 ¶ 18.

The Court first finds that the Promissory Note Agreement is a separate agreement from the BRA, and therefore, the modification provision in the BRA does not apply to the arbitration provision in the Promissory Note Agreement. The BRA explains that, should a loan get enough funding, Prosper will execute the Promissory Note Agreement on behalf of a borrower. *See* ECF No. 15-5 ¶ 24. The BRA also notes that "[t]he loan will be evidenced by a Promissory Note in the form set forth on the attached Exhibit A." *Id.* ¶ 5(b). Exhibit A of the BRA includes the entirety of the Promissory Note Agreement and contains spaces for the name of the borrower and the amount of the loan. *Id.* at 8. While the BRA represents the "entire agreement between you

and Prosper regarding your participation as a borrower on the platform[,]" *id.* ¶ 14, in contrast, the Promissory Note Agreement "evidence[es] the loan made by WebBank to you," *id.* ¶ 5(a).

Much like in *Hill*, the Promissory Note Agreement is a "specific, comprehensive document" distinct from the BRA. *Compare Coady*, 2020 WL 6785352, at *5 (noting because "no . . . separation exists" between the arbitration provisions and the modification provisions, the reasoning in *Hill* "loses strength"). In contrast with the BRA, the Promissory Note Agreement includes a provision that "[n]o provision of this Note shall be modified or limited" except by written agreement of the parties, ECF No. 15-6 ¶ 17, further evidencing that the two agreements are distinct from each other. In addition, the two documents were listed as separate agreements under the "Legal Agreements & Disclosures" page of each Plaintiffs' account with Prosper. *See* No. 21-893, ECF Nos. 15-4 at 2, 15-8 at 2; No. 21-1226, ECF No. 15-4 at 2. Finally, in each case, the Promissory Note Agreement was executed separately from the BRA. The promise to arbitrate in the Promissory Note Agreement was therefore not "illusory," and there was a mutually binding obligation between the parties to constitute sufficient consideration.

Finally, the Court turns to Plaintiffs' argument that they cannot be bound by the arbitration provision because they did not sign the Promissory Note Agreements. *See* ECF No. 17 at 36, 38. Unlike Plaintiffs' challenge to consideration, this dispute cannot be decided by the Court.

Plaintiffs do not dispute that they "clicked" assent to the BRA, and in Maryland, "clickwrap" agreements generally have been upheld. *See Lyles v. Chegg, Inc.*, No. 19-cv-3235-RDB, 2020 WL 1985043, at *3 (D. Md. Apr. 27, 2020) ("Courts applying Maryland law have upheld clickwrap agreements—that is, 'agreements that require a customer to affirmatively click a box on the website acknowledging receipt of an assent to the contract terms before he or she is

allowed to proceed using the website.'") (quoting *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009)). "Such agreements must 'give the user reasonable notice that a click will manifest an assent to an agreement.'" *Id.* (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Courts uphold "clickwrap so long as it 'reasonably communicate[s]' the existence of the contract terms." *Id.* (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (collecting cases)). Here, the full BRA was displayed to each Plaintiff upon clicking on the hyperlink. One of the terms of the BRA was that borrowers also assented to the signing, via attorney-in-fact, of the separate Promissory Note Agreement, which includes the mandatory arbitration provision. *See, e.g.*, ECF No. 15-5 ¶ 24. The terms of the Promissory Note Agreement were then displayed to Plaintiffs as Exhibit A.

By signing the BRA, Plaintiffs also authorized PMI to act as their agents to sign the Promissory Note Agreements on their behalf and therefore to bind them to the Promissory Note Agreements. "Agency is 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *MFI-DPLH, LLC v. Ingram*, No. 09-cv-2358-WDQ, 2010 WL 311636, at *4 (D. Md. Jan. 20, 2010), *aff'd*, 468 F. App'x 202 (4th Cir. 2012) (quoting *Green v. H & R Block*, 355 Md. 488, 503 735 A.2d 1039, 1047 (1999)). ""Actual authority exists only when the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it.'" *Id.* (quoting *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 565, 952 A.2d 304, 321 (Md. Ct. Spec. Apps. 2008)). After each Plaintiff signed the BRA, PMI executed the Promissory Note Agreements for Plaintiffs. The completed Promissory Note Agreements are identical to the blank examples, except for the addition of the dates, names, addresses, and loan amounts. *See* No. 21-893, ECF Nos. 15-6, 15-10; ECF No. 21-1126, ECF No. 15-6.

Plaintiffs argue that Prosper's authority to sign the Promissory Note Agreement was in violation of Maryland law, and thus the Promissory Note Agreements, and the arbitration agreements within them, were never formed. ECF No. 17 at 36; *see also Berkeley Cty.*, 944 F.3d at 238 (noting that a party can challenge the formation of an arbitration agreement by showing that "one party never agreed to the terms of the contract, [or] that a signatory did not possess the authority to commit the principal[.]"). Pursuant to CLEC, a loan agreement may not contain "[a] provision by which a person acting on behalf of a holder of the agreement, note, or other evidence of the loan is treated as an agent of the borrower in connection with its formation or execution[.]" Md. Code Ann., Com. Law § 12-1023 (b)(2)(iv). The CLEC goes on to state, "any clause or provision in an agreement, note, or other evidence of a loan that is in violation of this subsection shall be unenforceable." § 12-1023 (b)(4).

Plaintiffs do not challenge that they signed the BRA, which granted agency to PMI to execute Promissory Note Agreements. Whether it was legal to do so is a different question—one that the Court cannot adjudicate. The issue of whether the contract violated Maryland law implicates the whole of the underlying contract— not specifically the agreement to arbitrate. The "statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270 (1967) (citing 9 U.S.C. § 4). "A 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained." *Rent-A-Ctr.*, 561 U.S. at 70 (emphasis in original) (quoting 9 U.S.C. § 2). This is true even if the underlying agreement may be "void for illegality." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446, 126 S. Ct. 1204, 1209, 163 L. Ed. 2d 1038 (2006). "[W]here no claim is made that fraud was directed to the

arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Prima Paint Corp.*, 388 U.S. 395, 403–04. "[T]he doctrine of severability presumes an underlying, existent, agreement. Such an agreement exists, under the *Prima Paint* doctrine, even if one of the parties seeks to rescind it on the basis of fraud in the inducement." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000).[17]

***

To summarize, the Court's narrow role was to determine whether the arbitration provision, and the delegation clause within it, were supported by adequate consideration. Having found that the modification provision does not render Prosper's promise to arbitrate illusory in the Promissory Note Agreement, the Court finds that an agreement to arbitrate was formed. The delegation clause within the arbitration agreement reserves any questions of "validity or enforceability of this Section" to an arbitrator. Defendants' Motions to Compel are granted, and the Court will stay the action, pursuant to 9 U.S.C. § 3.

## C.  Motions to Certify

The Court finally turns to Plaintiffs' Motions to Certify Questions to the Maryland Court of Appeals. No. 21-893, ECF No. 19; No. 21-1126, ECF No. 19. Plaintiffs request to certify two questions to the Maryland Court of Appeals:

1.  Under Maryland law, does consideration for an arbitration agreement exist, by application of an implied covenant of good faith and fair dealing, equitable estoppel, or otherwise, where a document contains an arbitration clause but also contains a unilateral modification provision which allows

---

[17] Additionally, courts have noted that, based on ordinary contract principles, a contract can still be formed even if it was fraudulently induced. "[T]he distinction between fraud in the inducement and fraud in the execution is that, '[t]he former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is.'" *Sandvik AB*, 220 F.3d at 109 (quoting *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986) (citing 12 Williston on Contracts § 1488, at 332 (3d ed. 1970))). In the former case, a contract is still formed; in the latter, one is not. *See Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 590 (7th Cir. 2001) (fraud in the inducement "does not negate the fact that the parties actually reached an agreement[.]").

one party to change any term of the document at will, at any time, and without prior notice?

2. Does Md. Code Ann., Com. Law §§ 12-1001 et seq. ("CLEC") govern a loan pursuant to CLEC § 12-1013.1 when the "Terms of Use" under which the loan is obtained state that CLEC applies to "the loan," or does equitable estoppel prevent a borrower from asserting that CLEC governs where he also claims that, because CLEC applies, the signature on the promissory note is ineffective?

*Id.* Plaintiffs claim that these questions are determinative of the Motions to Compel Arbitration. *See id.* at 2.

"A federal court's certification of a question of state law to that state's highest court is appropriate when the federal tribunal is required to address a novel issue of local law which is determinative in the case before it." *Grattan v. Board of School Comm'rs of Baltimore City*, 805 F.2d 1160, 1164 (4th Cir. 1986) (citing *Lehman Bros. v. Schein*, 416 U.S. 386 (1974)). "[W]here there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary . . . 'guesses' and to offer the state court the opportunity to interpret or change existing law." *Colonial Props., Inc. v. Vogue Cleaners, Inc.*, 77 F.3d 384, 387 (11th Cir. 1996) (quoting *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 52 F.3d 913, 916–17 (11th Cir. 1995)). A district court may certify a question of law on an issue that is determinative of an issue in pending litigation and there is no controlling appellate decision. Md. Code Ann. Cts. & Jud. Proc. § 12-603.

"'[C]ertification is never compelled, and this [C]ourt remains under a duty to decide questions of state law, even if difficult and uncertain, when necessary to render judgment.'" *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 622 (D. Md. 2013) (quoting *Legard v. EQT Prod. Co.*, 771 F. Supp. 2d 607, 609 (W.D. Va. 2011) (internal citation omitted)). If there is no case law on point, a court must "attempt[] to do as the state court would do if

confronted with the same fact pattern." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994).

"Certification is unnecessary when existing authority permits the court to reach a 'reasoned and

principled conclusion.'" *Lynn*, 953 F. Supp. 2d at 622 (quoting *Simpson v. Duke Energy Corp.*,

191 F.3d 448 (4th Cir. 1999)).

As to Plaintiffs' first question, there was ample case law, both binding and persuasive, to

draw from in determining whether a contract to arbitrate exists. *See, e.g.*, *Cheek v. United*

*Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 149, 835 A.2d 656, 662 (2003); *Hill v. Peoplesoft*

*USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005); *Caire v. Conifer Value Based Care, LLC*, 982 F.

Supp. 2d 582, 595 (D. Md. 2013). Additionally, in light of the Court's conclusion, it is

unnecessary to address arguments related to equitable estoppel and good faith and fair dealing.

As to Plaintiffs' second question, interpretation of CLEC is also not required for the Court's

analysis and, as explained, the Court is prevented from expressing any opinion on the underlying

contracts. The Court declines to certify either question.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motions to Compel Arbitration are granted, and

the action is stayed. Plaintiffs' Motions to Certify Questions are denied. Additionally, the Court

will consolidate cases No. 21-893, No. 21-1914, and No. 21-1126 under lead case No. 21-893. A

separate Order follows.


Date: <u>March   21, 2022</u>                                   _/s/_____
                                                         GEORGE J. HAZEL
                                                         United States District Judge